OPINION OF THE COURT
Michael C. Curci, J.
The defendants having been arrested and charged with violations of sections 165.45 and 155.30 .of the Penal Law of the State of New York (more commonly referred to as “shoplifting”), moved the court to suppress statements made by them. It is conceded that they were never advised of their rights before they made their statements, in that the statements were taken before any advice or rights, Miranda or otherwise, were given to either of the two defendants. Upon this peculiar set of facts and circumstances, the issue is did the store detective have to give a Miranda warning before the taking of the statements or was the giving of the Miranda warning after the taking of the statements by the special patrolman sufficient as a matter of law.
*807 FINDINGS OF FACT
A store detective by the name of Rosaline Reid testified. Ms. Reid was not a special patrolman. On July 19, 1980, at about 2:30 P.M., she observed two suspicious customers, later identified as the two defendants, with various articles in their possession. The articles had belonged to the store. The defendant Arbino was talking to a clerk, while the female defendant Donna Glenn appeared to be dozing. Ms. Reid approached the defendants in an elevator and asked them if they had receipts for the articles they possessed. When neither defendant produced a receipt, they were escorted to the security office. Ms. Reid’s supervisor, a Ms. Iovino (all the names are spelled phonetically), and two other store detectives, Meyers and O’Malley were present. Although none of the detectives were presently special patrolmen, supervisor Iovino had been one at some time in the past. The defendants were questioned separately, one in one room, and one in another. Supervisor Iovino interviewed defendant Arbino; Detective Reid interviewed Glenn. Both defendants signed statements inculpating themselves. The defendants were not handcuffed, but the rooms were locked. On cross-examination, Detective Reid said the defendants were not free to leave. After the above statements were reduced to a writing, supervisor Iovino called Special Patrolman Flannigan, who was properly on duty that day. Five minutes after the statements were signed, Special Police Officer Flannigan came in. He testified that he was instructed by supervisor Iovino that the two defendants were to be arrested; he then, and only then, proceeded to advise the defendants of their rights. This method was “store policy”. It is to be noted that the warnings by the special police officer were given only after the incriminating statements had already been signed. There were no rights, or warnings, given to the defendants before the interrogation. Special Patrolman Flannigan testified that the forms upon which the statements were taken were forms regularly used for all shoplifting cases and that it is standard procedure.
CONCLUSIONS OF LAW
The store detectives are private persons and need not give *808 Miranda warnings, but a special patrolman, when acting as such, must. (People v Horman, 22 NY2d 378; People v Laurence, 100 Misc 2d 612; People v Smith, 82 Misc 2d 204; see, also, May v Shaw, 87 Misc 2d 808.) It would appear at first blush that this is just another “store detective” case, they being private citizens, therefore no Miranda warnings were necessary. However, when one dissects the peculiar “catch 22” set of facts and circumstances that exist in this case, one realizes that this may be a case of vis impressa, the facts being indeed novel. We could not find one case on all fours while researching New York State law and that of sister States. Both Detective Reid and Special Patrolman Flannigan in effect testified that there was a “procedure” and “store policy” which they followed. That “store policy” was in effect in that the store detective did not give Miranda warnings and that the store supervisor made the decision whether or not to prosecute only after the questioning of the suspects, and then only after a statement had been taken. After that time, the special patrolman was called in and he finally gave the Miranda warnings. Detective Reid also testified to the effect that defendant Glenn appeared to be under the influence of something because she appeared to be constantly dozing off. She also testified that she worked before with Special Patrolman Flannigan but was vague on the details not fully satisfying the court’s curiosity as to what exactly she meant by that comment. Detective Reid, not a special patrolman, testified rather strongly that she was not permitted to give Miranda warnings. It is only after the suspects inculpate themselves that the decision is made to arrest and prosecute, then the special patrolman is called in to take the defendants into custody and give the Miranda rights. This is the practice and “procedure” they must fol- - low. Special Police Officer Flannigan testified to the effect that he received a radio signal “1014” which he knew meant - “return to the office.” This all indicates to this court a pattern of procedure as to how this interrogation was executed. A statement is taken and the defendants are to be prosecuted, and it is only thereafter that the special patrolman gives the Miranda warnings, that is to say, after the damage is done.
The “catch 22” situation is obvious, the interrogation *809 takes place before the so-called “arrest” and Miranda warnings are given. Whether by design or ignorance the security officers and the special patrolman have succeeded in either a circumvention or a contravention of the defendants’ constitutional rights by the acting out of this absurdity. Ms. Iovino and the special patrolman did either intentionally or unintentionally execute by indirection that which is unacceptable by direct action. The store detectives do not give Miranda warnings, and the special patrolman who was immediately available only gives the warnings, after the statements are made. It is interesting to note in passing that supervisor Iovino was once a “special patrolman”, but it was “taken away from her”;, “all the supervisor’s shields were taken away” said Ms. Reid. The unanswered questions that come to mind are many.
CPL 60.45 (subd 2, par [b]) states in pertinent part that a confession or admission or other statement is “involuntarily made” by a defendant when it is obtained from him “by a person then acting under [the] direction or in cooperation with” a law enforcement official, etc., “in violation of such rights as the defendant may derive from the constitution” (italics supplied).
In these “store detective” cases, the national trend is towards enlarging the area in which Miranda warnings should first be given. Anything giving the appearance of unfairness is suspect. For some examples: A California court did not admit into evidence a store employee’s confession to a private security guard because the suspect was held for five hours. (People v Haydel, 109 Cal Rptr 222.) While the fact situation is different than ours the language of the decision is interesting, in that they held (supra, p 228) the security forces tended to “‘blur the line between public and private law enforcement.’ ” The court went on to comment (supra, p 228) that security officers should not be encouraged to delay involvement of the police in order to “extract from the suspect what the police might not.” While there is no doubt that this California case is not New York law, we find the language cited relevant.
In a recent case, as late as October 22, 1980, the Cal *810 ifornia Court of Appeals ruled a private security guard must give Miranda warnings in all cases. The California Supreme Court will now decide this issue in California. This case, while not binding as it is not New York law certainly must be observed. The case has caused quite a stir in legal circles in California, the California Retailers Association and Sears and Roebuck have filed amicus curiae briefs. (It is interesting to note that the store in our case has filed an amicus curiae brief.) California’s ever increasing population per force make decisions of its highest court important.
Washington, D.C., has gone very far in finding that private security guards are a “quasi-public police force” whose conduct should be equivalent to the police. We do not go that far here, nor is this the law of New York State, but we cite this case to show a national trend. This case is cited by Judge Ringel in his book “Search and Seizures” (1979 ed, pp 2-7, par 2.3 [a]) only as “LIMA - A2d D.C. App. [sic] ”. The California Supreme Court has held that when private security personnel make a statutorily authorized citizen’s arrest for a violation of the criminal law such as shoplifting, they do so “in aid of law enforcement authorities” (People v Zelinski, 24 Cal 3d 357, 367). The California court went on to state (supra, p 367) that such arrests meet the standard of “minimal official participation or encouragement” necessary to bring the conduct under constitutional restraints. Again, the case is not cited here as the law of New York State, but certainly suggests a trend.
An analogous point of law, not in fact, can be drawn from People v Bowers (77 Misc 2d 697) where the court held a private security guard, while not a peace officer, was in effect held to be an agent of the government. The court said that the guard’s purposes in the school were not educational • but security. Thinking this through we don’t believe the court meant to say that merely because he was not a teacher makes him a governmental agent per se. What we believe the court was doing was applying a standard of logic and fairness. Any other result would have been absurd.
The case that comes closest to ours in law in New York State is People v Jones (47 NY2d 528 [Wachtler, J.]), *811 decided July 3, 1979 by the Court of Appeals. In that case private store detectives questioned the defendant in the store’s'security office while the police officer waited outside. In that case, it was “normal procedure” for the county police officer to bring back the defendant to the store’s security office while the police officer waited outside; meanwhile the defendant, not free to leave was asked to sign various items by the security officer, all the while no one gave any Miranda warnings. A close reading of that case reveals facts which are not exactly on all fours with ours, but the law in that case is strong, and has application here.
The government, of course, cannot avoid constitutional restrictions by using a private individual as its agent (see, e.g., People v Esposito, 37 NY2d 156; GPL 710.20, subd 2), nor can it claim that only a private act is involved when government officers, subject to constitutional limitations, have participated in the act (see, e.g., Lustig v United States, 338 US 74).
Let us pull out some words and phrases from these various cases cited above to get a flavor of where they’re going. In so doing, we get the feeling that the modern “store detective” cases do not seem to stand or fall on the issue of whether the peace officer himself gave the Miranda rights or did he not? No, the words and phrases of the cases show an expansion of criteria. Note that one case speaks of “custodial atmosphere”, not turning upon the classical “custodial interrogation.” Another case toys with a rationalization that “the guard’s purpose was not educational but security.” Another decides to create a “quasi” public police force out of ordinary security guards. Another case complains that the security forces tend “to blur the line between public and private enforcement” and the security officers should not be encouraged “to delay involvement of the police in order to extract from the suspect that which the police could not.” Another case attempts to set a standard of “minimal official participation or encouragement.” A leading New York case did not like “normal procedure” that allowed the police officer to be “waiting outside”, as it were. What does this all mean? It means as far as the admissibility of an odd statement is concerned, the rule of fairness and logic will be considered in a proper case. Ab *812 surdities will no longer be permitted. If a special patrolman is hovering in the wings, in a proper case, we can presume he is not acting out the role of a dove of peace. We would feel that Special Patrolman Flannigan was hovering in the wings in this case. Therefore, we treat this case tantamount to him being present while the statements were taken. He was so immediately available only after the statement was taken that any other result would be an absurdity, and the law cannot countenance an absurdity. If he had been a distance away, or there had been an intervening episode that would have shown a demarcation before his coming into the room, we would have decided differently. But the procedure involved in his immediate appearance creates more questions than it answers. Furthermore, we are not going to dwell upon what effect the knowledge that Ms. Iovino must possess, played in this case, she having once been a special patrolman, but it certainly does lend color to the entire picture.
Therefore, while the statements of both defendants are suppressed, the case goes on. This for the reason that the court finds probable cause for the arrest and reasonable detention of both of the defendants. I find the procedures absent the lack of giving the Miranda warnings reasonable under all of the circumstances. I would recommend to this excellent -store that it alter its procedures ever so slightly to include the giving of Miranda rights if they are going to continue this procedure, having the special patrolman hovering in the wings while the former special patrolman takes a statement. In the alternative, either separate the two completely, or show a line of demarcation either by time or space, circumstantially or episodically which would manifest no connection whatsoever between the taking of the statements by the former special patrolman and the calling in of the special patrolman. In any event, the court rules clearly that the arrest was proper, there was more than merely sufficient probable cause for the arrest and detention. This court is ever mindful of the tremendous losses occasioned by various methods of shoplifting and internal pilferage. The court respects and recognizes the need and valid attempts of all of our city’s stores to protect themselves, and encourages same. In that regard, the court *813 offers this advice stated in two points of dicta, (1) this case appears to stand and fall upon its unique set of facts and (2) the stores in our city would indeed help themselves and then the public if they would tighten up the security procedures in every regard. Stores in New York City might inquire of the TSS method at Metropolitan Avenue in ' Queens. The customer is checked by a security guard very courteously on his way in and again on the way out before she or he descends a long narrow escalator: This is done very professionally and diplomatically as if the security guard is helping the customer with his cart, etc. It would appear that no one could complain about this procedure. Further there are other fire doors to answer that problem. The point is, pilferage must be practically nil. While every store does not have the same configuration, a lesson may be learned and modification of this plan could conceivably save millions of dollars. While an “ounce of prevention is worth a pound of cure”, if the cure is questionable then it would do more harm than good. Questionable “store policies” which occurred as a matter of fact in this case help no one in the long run. While there is no question but that the store personnel where authorized to make, what was in this case an entirely authorized and proper arrest (see General Business Law, § 218), to paraphrase what was “normal procedure” in the Jones case (47 NY2d 528, supra), the “store policy” in this case should certainly be reformed. Having a “store policy” by which one ex-“special patrolman” causes statements to be taken in locked rooms while the presence of the special patrolman hovers in the wings, his coming in after the statement is taken to give the Miranda warning is an absurdity. We need professional protection from thieves, not a “catch 22” absurd approach. It is the court’s opinion that this decision will indeed help the public and the stores in avoiding illogical extensions, future excesses worse than the fact situation in this case. It is therefore conceivable that the store and the public can gain immeasurably by heeding the advice of this dicta.
The motion is granted to the extent that the statements of both defendants are suppressed.